# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| **CEDRIC ADAMS** | * | **CIVIL ACTION NO. 11-1466**<br>**Section P** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **TARREN HAFORD, ET AL.** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Upon reference of the District Court pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned Magistrate Judge held an evidentiary hearing on January 30, 2013, for purposes of entertaining testimony and evidence presented by all parties of record on all remaining issues in the case. At the conclusion of plaintiff's case-in-chief, defendants moved for judgment on partial findings.

For reasons set forth below, it is recommended that the motion for judgment on partial findings be **DENIED**; it is further recommended that plaintiff Cedric Adams' claims against defendants, Warden Harris, Captain Poche', Deputy Tarren Hafford, and the East Carroll Detention Center be **DISMISSED, with prejudice**.

## Background

On August 10, 2011, Cedric Adams, proceeding *in forma pauperis*, filed the instant, pro se civil rights complaint pursuant to 42 U.S.C. § 1983 against the East Carroll Detention Center ("ECDC"); former ECDC warden, Ronnie Harris; former ECDC supervisor, Captain Joseph Poche'; and former ECDC guard, Tarren Hafford (sometimes referred to by the parties as "Tarren Hanford" or in the caption as "Tarren Haford"). Plaintiff currently is an inmate at the David

Wade Correctional Center, in the custody of Louisiana's Department of Public Safety and

Corrections ("LDOC").  During the events at issue, however, Adams was housed at the ECDC,

Lake Providence, Louisiana.[1]  Adams contends that on May 23 and 24, 2011, defendant, Tarren

Hafford, choked him into unconsciousness, threw him to the floor, and later kicked him after

Adams reported the initial incident to Captain Poche'.  Adams further contends that Captain

Poche' was deliberately indifferent to his medical needs by failing to authorize his transfer to the

hospital for treatment of injuries that Adams suffered as a result of the attack.

    In his original complaint, plaintiff requested monetary damages, plus a transfer out of

Lake Providence for his safety.  In his pretrial statement, he expanded his requested relief to

include not only compensatory damages, but also punitive damages, attorney's fees, costs, and

any other equitable relief the court may deem necessary.

    Following initial review, and the filing of an amended complaint, the court ordered

service upon the individual defendants, Harris, Poche', and Hafford.  *See* Jan. 5, 2012, Mem.

Order [doc. # 8].[2]  On April 24, 2012, defendants answered the complaint.  [doc. # 17].  The

court afforded the parties time to conduct discovery and to file dispositive motions, if

appropriate.  *See* Jan. 5, 2012, Mem. Order [doc. # 8].   Neither side filed a motion for summary

judgment.  Accordingly, the undersigned scheduled the matter for an evidentiary hearing,

representing "**a complete hearing of all witnesses and evidence to be presented by all parties**

**of record**."  (Sept. 12, 2012, Order [doc. # 25]).  The evidentiary hearing pursuant to 28 U.S.C. §

---

[1]  The outgoing East Carroll Parish Sheriff, Mark Shumate, closed the ECDC in
December 2011.

[2]  The court did not order service on ECDC because it is not an entity capable of being
sued.  *See* discussion, *infra*.

2

636(b)(1)(B) and *Flowers v. Phelps*, 956 F.2d 488 (5th Cir.1992), *modified on other grounds*, 964 F.2d 400 (5th Cir.1992), was held on January 30, 2013.  The matter is now before the court.

## Hearing Testimony and Evidence

At the hearing, the court heard testimony from plaintiff Cedric Adams; the individual defendants, Harris, Poche', and Hafford; former ECDC nurse Lena Middlebrooks; and former ECDC inmates, Danny Carter, Jaylon Richburg, and Shawn Peterson.   The court also received into evidence the following joint exhibits,

1.      Excerpts from the East Carroll Parish Sheriff's Policy and Procedure Manual;

2.      Unusual occurrence, incident, and investigation reports involving plaintiff while he was incarcerated at ECDC and/or Riverbend;[3]

3.      Grievances filed by plaintiff while incarcerated at Riverbend and/or ECDC;

4.      Plaintiff's ECDC/Riverbend medical records;

5.      Excerpts from plaintiff's inmate file during his tenure at Riverbend/ECDC; and

6.      Plaintiff's disciplinary records from Riverbend/ECDC.

The testimony and evidence focused upon three broad issues:  exhaustion of administrative remedies, the events of May 23-24, 2011, and plaintiff's subsequent efforts to obtain medical treatment.

## I.      Hearing Testimony

1)      Plaintiff's Testimony

Cedric Adams testified that on May 23, 2011, Officer Tarren Hafford grabbed him around the neck in the kitchen and dragged him to the bathroom where he lost consciousness.  Hafford

_____

[3]  Riverbend is another prison operated by the East Carroll Parish Sheriff.

then threw Adams to the floor in the bathroom hallway. When Adams regained his senses, he reported the incident to Captain Poche', who advised him to write an ARP or grievance on the matter. When Adams departed and walked back down the hall, Hafford came up behind him, kicked him in the back, and advised him to go tell that to Captain Poche'. Hafford then grabbed Adams around his neck and escorted him to his dormitory. Hafford cautioned Adams not to leave there, or he would "jump" him. To ensure that Adams did not report the latest incident, Hafford locked Adams in the dormitory.

Adams contends that Captain Poche' was at fault for failing to instruct Hafford to keep his hands off of Adams.

The next morning (i.e. May 24), Adams wrote an ARP/grievance, and gave it to Captain Poche' who stated that he would handle it, and asked Adams to drop the matter. Apparently, Adams was not willing to drop the matter because Poche' proceeded to take Adams to see Warden Harris. Adams contends that Poche' would not have taken him to see the warden unless he had completed a written "ARP" as required by the grievance process.

On May 24, Adams also went to the captain's office and requested medical attention from the nurse. Adams complained that his back was hurting and that he had blood in his urine. Adams was advised that he would be placed on the list to see the doctor. He later was summoned back to the nurses' station by Captain Poche' who acknowledged that he would be examined by a physician, but that there would be consequences if the physician did not discover any injuries.

Adams testified on cross-examination that on May 24, 2011, Officer Hafford grabbed him around his neck and pushed him into his bunk rack. Adams stated that he did not file a grievance

for the May 24 incident.

On May 26, 2011, Adams "again" made sick call because the blood in his urine had thickened.  He was advised that he would be okay.  However, he was not sent to the doctor. Adams conceded that when he was seen by the nurse on May 26, he did not have any bruises from his encounters with Officer Hafford.

On June 21, 2011, Adams saw the nurse and complained about athlete's foot.  Adams agreed that he did not have any other complaints that day.  Adams saw the nurse again on July 17, 2011, for complaints of dizziness, but had no other complaints.  Adams admitted that he saw the nurse on three other occasions in July-August 2011 for myriad complaints, but none were for blood in his urine.

Adams stated that Officer Hafford continued to use excessive force by choking him from time to time.

According to Adams, by July 27, 2011, he had been transferred to Hunt Correctional Center, St. Gabriel, Louisiana.  Thus, he contends that he could not possibly have submitted a statement recounting additional incidents purportedly committed by Officer Hafford on other inmates, which ultimately culminated in Hafford's termination from employment.

Adams continues to experience blood in his urine from time to time.  For instance, he stated that in November 2012, he was hospitalized for blood in his urine and loss of blood. Adams reported that sometimes when he urinates, he passes out on the floor for up to ten minutes.  According to Adams, one physician advised him that this was normal.

2)    Shawn Peterson

On May 23, 2011, Peterson was an inmate housed at ECDC.  He never saw an officer

place his hands on Adams.

      3)    <u>Danny Carter</u>

On May 23, 2011, Carter was an inmate housed at ECDC.  He never saw an officer place his hands on Adams.

      4)    <u>Jaylon Richburg</u>

In May 2011, Richburg was incarcerated at ECDC.  Richburg never observed an officer assault an inmate.  He does not recall signing a statement that he witnessed an assault on an inmate.[4]

      5)    <u>Tarren Hafford</u>

Hafford denied that he ever choked, dragged, or kicked Adams.

On March 24, 2011, Hafford wrote Adams up for possession of a cell phone.

Hafford stated that Warden Harris queried him about the allegations made by Adams against Hafford.

Hafford denied that he had ever been written up for excessive use of force.  He conceded, however, that he was discharged or resigned because of allegations of excessive use of force.

Hafford was not aware of any grievance filed by Adams against him.

      6)    <u>Lena Middlebrooks</u>

Middlebrooks is a licensed nurse practitioner employed by the East Carroll Parish Sheriff.

During regular hours, if an inmate needs medical care, he can fill out a medical request form.

---

[4]  Plaintiff declined to call Jonathan Howard and Cocoa Coleman, whose presence the court secured via writ and subpoena, upon plaintiff's motion.

Middlebrooks saw Adams on May 26, 2011.  Although Adams complained of being kicked, he exhibited no bruising or abrasions.  Middlebrooks indicated that Adams had an arrogant attitude.

On May 26 and June 1, Adams did not complain to Middlebrooks about blood in his urine.  If Adams had complained about blood in his urine, Middlebrooks would have documented the complaint and sent him to the doctor.  In fact, when Adams complained of a swollen right knee, Middlebrooks sent him to see Dr. Bailey.

On cross-examination, Middlebrooks strongly denied that she would have told Adams that he would be okay if he had complained to her of blood in his urine.

7)    <u>Joseph Poche'</u>

Poche' has 20 years of law enforcement experience.  He is POST-certified.

Adams told Poche' that Officer Hafford had "jumped" or assaulted him.  Consequently, Poche' took Adams to the warden's office so he could be interviewed.

Poche' tried to obtain statements from other inmates to corroborate Adams' account, but was not successful.  Poche' then took Adams to the medical department where he was seen by a nurse.

Poche' did not observe any cuts or bruises on Adams.  However, he did not prevent Adams from going to medical.  He also does not recall Adams returning to him to make another complaint.  According to Poche', Adams never gave him a grievance or anything in writing.

If Adams had brought Poche' a written grievance, then Poche' would have brought it to the warden, who would have assigned it a number and logged it in a book.

Poche' agreed that the administrative review process consisted of three steps:  first, chief

of security; second, the warden; and third, the Department of Corrections.

Because of the seriousness of Adams' allegations, Poche' took him to see the warden even though Adams had not submitted a written grievance.

Poche' denied that he ever received a statement from Adams or from any other individuals concerning the incidents at issue.

8)   Ronnie Harris

In May 2011, Harris was an assistant warden at ECDC.  He no longer works there, however, because the prison closed down.  Harris was in law enforcement for 13 years.  He is POST-certified.

According to Harris, an ARP has three steps:  at the first step, the inmate turns the grievance in, and the captain would receive it.  If the situation is not handled, then the grievance goes to the warden.  At the third step, the grievance goes to the sheriff.

If an inmate needs to be seen by the medical department, then the inmate may sign the sick call log.

Harris recalled that Captain Poche' brought Adams to his office in May 2011 because he had made a complaint.  Harris listened to Adams' complaint.  He also asked Poche' to investigate the allegations.  Moreover, Harris immediately called in and interviewed Officer Hafford.  Ultimately, however, Harris was unable to substantiate Adams' complaint.

Harris advised Adams to write a statement regarding the incident.  However, Adams never provided Harris with a statement.  If Harris had received an inmate grievance, there would have been some writing or documentation on it confirming receipt and how it was processed.

Adams never came back to Harris to make any other complaints.

8

Harris never prevented Adams from receiving medical care.  Rather, the medical department has full control of who receives medical care.

Harris testified that ECDC and Riverbend operate under the same umbrella, and utilize the same forms.  Harris said that he used the forms interchangeably between the two facilities.

## II.    Joint Hearing Exhibits

1)    Excerpts from the East Carroll Parish Sheriff's Policy and Procedure Manual

The manual specifies that the use of force for punishment or reprisal is strictly prohibited. Furthermore, staff is required to minimize the amount of force in those situations where use of force is required.  All uses of force must be documented.  The warden must be notified immediately when force is used.

2)    Adams' Unusual Occurrence and Investigation Reports

a)    On January 11, 2011, Lena Middlebrooks completed an unusual occurrence report on Adams wherein she documented that he had been involved in a fight and suffered several lacerations.  She cleaned the wounds, and referred Adams to E.A. Conway emergency room for evaluation.

b)    On August 30, 2011, Ronnie Harris completed an unusual occurrence report for "RIVERBEND DETENTION CENTER PHASE III,  in which he noted that he received a telephone call that date  from "Mrs. Pat Fairchild" advising him that Cedric Adams had filed a lawsuit against "Tarren Hanford, et al."

Harris noted that in a letter addressed to "Mrs. Angela McCullough," Adams

9

claimed that Hafford had "chocked [sic] him down" in the hall.  Harris further

noted that Adams claimed to have made sick call on May 24 and 25, 2011, but his

medical record indicated that he made sick call on May 24 and 26.  Harris stated

that Adams' medical records made no mention of complaints of blood in his

urine.

Harris confirmed that two offenders were involved in altercations with Officer

Hafford on July 23 and 27, 2011.  One offender was treated at Conway Hospital

for trauma to his head.  The other offender was seen on-site by the facility medical

department.  Harris confirmed that on July 27, 2011, Hafford was terminated for

excessive use of force, and arrested for malfeasance in office.

Harris noted that Captain Poche' denied receiving a grievance filed by Adams.

Poche' also denied refusing to send Adams to the doctor after the incident.

c)     Harris also completed an unusual occurrence report for RIVERBEND

DETENTION CENTER PHASE III that he dated May 24, 2011.  The report states

that

[o]n the above date and approximate time I was advised by Captain
Joe Poche that Offender Cedric Adams was alledging [sic] that
Officer Tarren Hanford had "chocked him down" on May 23,
2011, and Offender was requesting to speak with me.  I called the
Offender to my office and spoke with him about the incident.  I
also questioned Officer Tarren Hanford about the incident.  After
speaking with Offender Adams, I advised him to write a statement

10

reguarding [sic] the incident.  I have not recieved [sic] a statement
and to my knowledge the Offender has not filed a greivance [sic]
with our department.

3)   Plaintiff's Grievance Records

   a)   On a form entitled "Inmate Grievance," Cedric Adams wrote

   [o]n 05-24-11 I Cedric Adams woke up and went to brush my teeth
   when I returned officer terran [sic] Haford grabbed me around the
   neck and pushed me into my rack. I went to intake and he soon
   came asking for my I.D.  When I came to get it for Him [sic] I was
   grabbed around my neck and pushed to the floor [sic] when I got
   up I was told to get in my Dorm and not come out.

   The pre-printed portion of the "Inmate Grievance" form directs the inmate to send

   the grievance to the Warden within 30 days of the complained of incident.  It

   further directs the inmate to request a copy, and to use a separate form for each

   grievance.  After 20 days, if the inmate has not heard from the "First Respondent,"

   then he may file a request for Warden's Review within five days thereafter.

   b)   This document is entitled "Inmate Grievance," and is entirely handwritten,

   apparently by Cedric Adams.  He wrote that

   [o]n 05-23-11 I Cedric Adams DOC # 182811 was standing in the chowline [sic] I
   was approach [sic] by officer Tarren Hanford.  AS [sic] I grabbed my tray officer
   Hanford grabbed me around the neck and said to go dump the tray.  I did as I was
   told but officer Hanford never released my neck.  I was then taken out the back
   door and into the hallway of unit 1 as I got there I was dizzy [sic] Officer Hanford
   continued to chock [sic] me until I passed out [sic] then he throwed [sic] me on
   the floor and left me there.  When awoke [sic] I went to my dorm only to be
   followed by officer Hanford.  He then punched me in the back.

Adams asked to be shipped to a different facility because he feared for his life.

11

c)      This document is handwritten, and entitled "A Request for Administrative

Remedy Procedure."  It is addressed to the Department of Corrections from

Cedric Adams; it states, in part,

> [o]n May 24, 2011, Petitioner Cedric Adams # 182811 wrote a
> grievance on officer Terrance Haford for chocking [sic] me and
> kicking me in the back.  On May 24, 2011 [sic] I petitioner Cedric
> Adams spoke with the Captain and Warden Harris about the
> situation.  I was told to write a statement about what had happened.
> After leaving the Warden's office I went to see the nurse, I was
> told to make sick call [sic] on May 26, 2011 I made sick call and
> explained that my back was hurting and I was urining [sic] a lot of
> blood.  I was told that I'd be placed on the doctor's list.  It has been
> nearly a month and I the petitioner Has [sic] yet to receive any
> medical attention. . . .

Adams concluded his statement by requesting a transfer to a D.O.C. facility, or

alternatively, monetary damages because the guards were deliberately  indifferent to his

serious medical needs.  Adams indicated at the bottom of the document that it was sent on

05-29-11.  However, it appears that the date originally said 06-29-11, but the "6" was

overwritten into a "5."

d)      This document is an undated letter addressed to a "Ms. Angela McCullough" that

is stamped "RECEIVED" on August 24, 2011 by "OGB LEGAL."  It includes a

facsimile machine time/date stamp of "AUG-29-2011 09:07" from the "EAST

CARROLL SHERIFF TAX."  The letter states that

> On [no date or time given]  I Cedric Adams was choked out by an officer here at
> East Carroll Detention Center [sic] once I passed out I was tossed to the floor in a
> bath-room.  Several days later, I walked out of my dorm only to be grabbed
> around the neck and choked out once more this time every one in the dorm was
> there to see.  I filed a grievance and was told by the captain of security that he
> would check into this.  The next day I was choked out on the hallway right outside
> of my dorm.  I went to the captain's office the next morning and was taken to

12

speak with the warden (warden harris) he had me to write a statement and to list witnesses.  I did and when I left his office as I walked down the hall I was approached from behind by the officer (Tarren Haford) He ran up behind me and kicked me in my lower back.  That evening I had blood in my urine.  The next morning I made sick call.  I told the nurse what happen [sic] she advised me that if it continued to come back.  The next day I made sick call again because I was affaid [sic] because the blood had gotten thicker she said she would send me to the doctor, but an half hour later I was called back to the nurse station and told by the captain (Poche') that I wouldn't be going nowhere.  I had blood in my urine for a week after this, this officer beat several other inmates sending three to the hospital for stitches, [sic] This officer was then sent home only to come back the next day and beat two more inmates.  When the warden called the officer into his office the officer threatened to beat him.  The officer was then fired.  The next day the officer was arrested for malfeasance in office and two counts of battery.  I filed a 1983 civil law suit. [sic] About the abuse that I've suffered I writting [sic] you to find out what all I would need to have for this case.  I have a copy of the grievance that were written and each time a person makes sickcall it is logged into a sickcall log book.  When I filed the '1983' I listed the officer's name, the captain's name the warden's name and the facility that I'm housed at . . . .

Adams signed the foregoing letter, and recited the civil action number and caption assigned to this case.

4)      Plaintiff's Medical Records

These records document  numerous instances where plaintiff was seen by the ECDC nurse.  They reflect that Adams was seen by the nurse on May 26, 2011, with a complaint of being kicked on May 24.  However, the nurse observed no bruises, abrasions, or breaks.  The notes further indicate that Adams was on Naproxen, and that he had an attitude.

Adams saw the nurse at least five more times between June and August 2011 for myriad complaints.  However, there were no complaints of blood in his urine.

5)      Excerpts from Plaintiff's Inmate File

These records confirm that Adams was transferred from ECDC to Hunt Correctional Center on September 6, 2011.  He then was transferred to Forcht-Wade on September 19, 2011.

13

6)      Plaintiff's Discipline Records

This exhibit is four pages long, and is a series of reports completed by Tarren Hanford

documenting a March 4, 2011, incident where Hanford caught Adams with a cell phone in his

bunk.

**Analysis and Resolution of Disputed Facts**

"An evidentiary hearing consistent with *Flowers v. Phelps* amounts to a bench trial

replete with credibility determinations and findings of fact." *Adkins v. Kaspar*, 393 F.3d 559,

563 (5th Cir. 2004) (citations and internal quotation marks omitted).  Further, "[a] civil plaintiff

seeking to recover damages for use of excessive force must prove his claim by a preponderance

of the evidence." *Yarrito v. Cook*, 1995 WL 17788756 (5th Cir. June 22, 1995) (unpubl.)

(citation omitted).  "Preponderance" means that it is more likely so, than not so.  *Matter of

Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1164 (5th Cir. 1993) (citation omitted).  It remains

within the province of the finder of fact to weigh conflicting evidence and inferences and to

determine the credibility of witnesses.  *See Yarrito, supra.*

At the close of the presentation of plaintiff's evidence herein, defendants petitioned the

court for a judgment on partial findings.  In a bench trial, "the appropriate vehicle for dismissing

a case as a matter of law at the close of plaintiff's evidence is a Rule 52(c) judgment on partial

findings." *Weber v. Gainey's Concrete Products, Inc.*, 1998 WL 699047, *1 n1 (5th Cir. Sept. 21,

1998) (unpubl.) (citation omitted).  Rule 52 provides, in pertinent part,

> **Judgment on Partial Findings**.  If a party has been fully heard on an issue during
> a nonjury trial and the court finds against the party on that issue, the court may
> enter judgment against the party on a claim or defense that, under the controlling
> law, can be maintained or defeated only with a favorable finding on that issue.
> The court may, however, decline to render any judgment until the close of the

14

> evidence. A judgment on partial findings must be supported by findings of fact
> and conclusions of law as required by Rule 52(a).

Fed.R.Civ.P. 52(c).

When deciding a case pursuant to Rule 52(c), the court is not required to make any special

inferences or construe the facts in the light most favorable to the plaintiff. *Weber, supra*.

Because the instant decision relies, at least in part, on defendants' testimony, the court is

unable to render judgment on partial findings based solely upon the testimony and evidence

adduced by plaintiff in his case in chief. *See* discussion, *infra*. Thus, judgment on partial

findings is not warranted.

## **Findings**

### I.    **Exhaustion of Administrative Remedies**

   a)    Law

Pursuant to 42 U.S.C. § 1997e, as amended by the Prison Litigation Reform Act

("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of

this title or any other Federal law by a prisoner confined in any jail, prison, or other correctional

facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Exhaustion is mandatory, and is required even where the relief sought cannot be granted by the

administrative process. *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S.Ct. 2378, 2382-83 (2006)

(citations omitted). All "available" remedies must be exhausted, whether speedy and effective,

or not. *Porter v. Nussle*,  534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002).  "Proper exhaustion

requires that the prisoner not only pursue all available avenues of relief but also comply with all

administrative deadlines and procedural rules." *Johnson v. Kukua*, 342 Fed. Appx. 933, 934 (5th

Cir. Aug. 20, 2009) (unpubl.) (citing *Woodford v. Ngo*, 548 U.S. at 89-93, 126 S.Ct. 2378)).  An

15

untimely or otherwise procedurally defective administrative grievance does not satisfy the exhaustion requirement.  *Id.*

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter, supra* (citation omitted).  An inmate is required to "exhaust his remedies, irrespective of the form of relief sought, injunctive or monetary." *Richbourg v. Horton*, 2008 WL 5068680 (5th Cir. Dec. 2, 2008) (unpubl.) (citation omitted). Exhaustion also applies to claims brought against defendants in their official and/or individual capacities.  *See e.g., Williams v. Henagan*, 595 F.3d 610, 618 (5th Cir. 2010); *Hines v. Texas*, 76 Fed. Appx. 564 (5th Cir. Sept. 29, 2003) (unpubl.).

Exhaustion is an affirmative defense; thus, the burden is on defendant to establish that plaintiff failed to exhaust available administrative remedies.  *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (citation omitted).  The court is authorized to resolve factual disputes concerning exhaustion.  *Id.*

Under Louisiana law, the Department of Public Safety and Corrections and each sheriff is authorized to adopt an administrative remedy procedure at each of their institutions.  La. R.S. 15:1171.  The administrative remedy procedure is intended to resolve complaints and grievances that arise while the offender is in the custody of, or under the supervision of the department or sheriff.  *Id.*  The procedure encompasses complaints and grievances for monetary, injunctive, declaratory, or other relief stemming *inter alia* from conditions of confinement, personal injuries, and medical malpractice.  *Id.*  These administrative procedures, when promulgated, provide the offender's exclusive remedy – to the extent that federal law permits.  *Id.*  Finally, "status as an

16

'offender' is determined as of the time the basis for a complaint or grievance arises.  Subsequent

events, including posttrial judicial action or release from custody, shall not affect status as an

'offender' . . ."   La. R.S. 15:1171(D).

The Fifth Circuit has consistently held that an inmate's ignorance of a prison's grievance

procedures does not excuse his noncompliance.  *Aguirre v. Dyer*, 233 Fed. Appx. 365 (5th Cir.

May 24, 2007) (unpubl.) (citation omitted); *Simkins v. Bridges*, 350 Fed. Appx. 952, 953-954,

(5th Cir. Oct. 28, 2009) (unpubl.) (citation omitted); *Plaisance v. Cain*, 374 Fed. Appx. 560, 561,

( April 15, 2010) (unpubl.) (citation omitted).  Nonetheless, inmates should have "avenues for

discovering the procedural rules governing their grievances."  *Dillon v. Rogers*, 596 F.3d 260 (5th

Cir. 2010) (citations omitted).  When an inmate has no means of verifying the administrative

grievance process, then misleading information by prison officials may make remedies

unavailable.  *Id.*

As the Fifth Circuit recently emphasized, "[i]f impediments to filing grievances render

remedies unavailable at one facility, remedies may become available again once a prisoner has

been transferred, unless there are other problems at the new facility."  *Dillon*, 596 F.3d at 267-

268 (citing *Bryant v. Rich*, 530 F.3d 1368, 1379 (11th Cir.2008)).  Stated another way, the

grievance filing period is tolled only so long as the inmate is actually impeded from invoking and

exhausting the process.

     b)     <u>The ECDC Had an Available Administrative Remedy Procedure</u>

The evidence establishes that the ECDC had an administrative remedy procedure in effect

during the relevant period.  Although defendants did not adduce evidence of a formal, written

grievance policy, the inmate grievance form completed by Adams documented that an inmate

17

needed to send the form to the warden within 30 days after the complained of incident. Furthermore, if, after 20 days, the inmate received no response to his initial grievance, then he could file a request for warden's review within five days thereafter.

At the hearing, plaintiff elicited from Captain Poche' that the grievance procedure included a third step – submission of the complaint to the Department of Corrections.  Plaintiff agreed with Poche's description of the three step process.  On the other hand, former warden Harris testified that the third step of the grievance process entailed an appeal to the sheriff.

Under these circumstances, the court finds that, at a minimum, there was a two-step grievance procedure in effect at ECDC during the relevant period.  As explained above, the first step required submission of a written grievance to the warden, who then would refer it to the "First Respondent" for review.  If the inmate remained unsatisfied with the initial response, or if he did not receive a response after 20 days, then the inmate could request review by the warden.

     c)    <u>Adams Did Not Exhaust Available Administrative Remedies</u>

The undersigned finds that defendants have established by a preponderance of the evidence that plaintiff did not timely submit a written grievance regarding the alleged battery(ies) inflicted on him by defendant, Hafford.  Warden Harris and Captain Poche' both denied that they received written grievances from Adams.  Furthermore, Adams stated that he did not submit a grievance for the alleged incident of May 24.  His credibility is undermined, however, because one of the grievance forms that he completed expressly states that it applied to the May 24 incident.  Although the evidentiary record *does* include a handwritten inmate grievance that complains of the May 23 incident, the court credits Harris and Poche's testimony that they never received the grievance(s).

Moreover, even if plaintiff had submitted initial grievances for the events of May 23-24, there is no evidence (either exhibits or testimony) that Adams proceeded to the second step of the grievance process by submitting a request for warden's review after he failed to receive a response to his initial grievance(s).

The two remaining grievance-related documents in the evidentiary record do not help to establish plaintiff's compliance with steps one and two of the grievance process.  First, plaintiff's handwritten "Request for Administrative Remedy Procedure" ("ARP") was addressed to the Department of Corrections, not to the warden, as required by steps one and two of the grievance process.  Moreover, there is no evidence that the warden ever received this ARP.

Second, plaintiff's letter addressed to Angela McCullough was sent *after* he filed the instant lawsuit.  The PLRA mandates exhaustion of administrative remedies *before* filing suit.  *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).  Thus, plaintiff's post-suit submission does not advance his exhaustion requirement.  Furthermore, the district court has no discretion to waive the pre-filing exhaustion requirement.  *Gonzales, supra*.

The undersigned further finds that plaintiff did not submit a first or second step grievance regarding his inadequate medical care claim.  Harris and Poche' uniformly denied receiving any grievance from plaintiff.  Moreover, the only written grievance in the record that addresses the lack of medical care is addressed to the Department of Corrections.  Again, this submission does not evidence compliance with the first two steps of the grievance process.

In addition to the lack of supporting written evidence and the inconsistencies between the written forms that *do* appear in the record, the court's credibility determination is buttressed by the failure of plaintiff's witnesses to corroborate his story.  Plaintiff testified at the hearing that

19

he obtained two witnesses to verify his story and sign his statement.  Plaintiff's amended
complaint suggests that these witnesses were Lonnie Peters, Jaylon Richburg, and/or Shawn
Peterson.  At the hearing, however, Richburg and Peterson denied knowledge of any battery by a
corrections officer.[5]  While plaintiff contends that Richburg and Peterson were coerced to testify
falsely, the court is not so persuaded.  Richburg, Peterson, and Carter (who also disclaimed
knowledge of any wrongdoing) all are housed at different facilities.  There is no indication that
they potentially faced reprisal at their current places of incarceration if they had supported
plaintiff's version of events.

Plaintiff further testified that one of his witnesses at the hearing also was beaten by
Hafford.  Thus, this witness should have been motivated to support plaintiff's case.

The court further notes that Adams disclaimed any knowledge of the subsequent incidents
of July 23 and 27 involving Officer Hafford because, according to Adams, by that time, he had
been transferred to Hunt Correctional Center.  However, plaintiff signed the grievance wherein
he recited these very events.  Moreover, plaintiff's prison record confirms that he was not
transferred to Hunt Correctional Center until September 6, 2011.  Finally, when plaintiff filed the
instant suit on August 10, 2011, he listed the ECDC as his return address on the envelope.  *See*
doc. # 1.

The court finds it peculiar that plaintiff would take pains to deny knowledge of the
subsequent incidents that Hafford was involved in.  One plausible reason that motivated plaintiff
to deny knowledge of the July 2011 incidents is that these latter incidents were what actually

_____

[5]  Peters was not at the hearing because plaintiff did not provide a valid address for
service of a subpoena.

20

spurred plaintiff to resurrect his contentions from May 2011.  By that time, however, plaintiff already had missed the deadlines to exhaust administrative remedies.

In sum, the undersigned finds that plaintiff failed to exhaust his administrative remedies.

d)       Remedy for Failure to Exhaust

The plain language of the PLRA precludes any further action on plaintiff's claims until he has fully exhausted the administrative remedy procedure.  *See Wendell v. Asher*, 162 F.3d 887, 890-91 (5th Cir.1998) (§ 1997e(a) "plainly requires that administrative remedies be exhausted before the filing of a § 1983 suit, rather than while the action is pending ... [t]o hold otherwise would encourage premature filing by potential litigants, thus undermining Congress' purpose in passing the PLRA, which was to provide the federal courts some relief from frivolous prisoner litigation.").

However, the court may reach the merits of the complaint notwithstanding plaintiff's failure to exhaust when, as here,

> the only issue presented to the court is a clearly focused § 1983 constitutional claim, where the state [sought] judgment on the merits (in addition to invoking PLRA exhaustion), where the parties engaged in discovery, and where the purposes of PLRA exhaustion would be confounded by requiring administrative exhaustion at this stage . . .

*Thorson v. Epps*, 701 F.3d 444, 446 (5th Cir. 2012).

Furthermore, dismissal, at this stage, for failure to exhaust is effectively a dismissal with prejudice because of Adams' failure to timely invoke the grievance process.  Accordingly, the undersigned will proceed to the merits of plaintiff's complaint.

II.     **Excessive Force and Cognizable Physical Injury**

a)     <u>Law</u>

When a prison official is accused of using excessive physical force in contravention of the Eighth Amendment's Cruel and Unusual Punishments Clause, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*,  503 U.S. 1, 7, 112 S.Ct. 995, 999 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078 (1986)).; *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir.1997).  However, not every malevolent touch by a prison guard gives rise to a federal cause of action.  *Id*. (citation omitted).  The Eighth Amendment also does not protect against "de minimis" use of physical force, so long as the use of force is not of a sort "repugnant to the conscience of mankind."  *Id*.  (citation and internal quotation marks omitted).[6]  Thus, in considering an excessive force claim, the court should consider the following factors, (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any effort made to temper the severity of a forceful response.  *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir.1999).

b)     <u>Plaintiff Failed to Establish that Officer Hafford Subjected Him to Excessive Force on May 23-24 (or at any other time)</u>

This case hinges upon credibility.  If the court were to credit fully plaintiff's version of

---

[6] The PLRA further provides that "[n]o [f]ederal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C.A. § 1997e(e).  The Fifth Circuit has equated § 1997e(e)'s "physical injury" requirement with the standard used under the Eighth Amendment; that is, an injury that is more than de minimis, but not necessarily significant.  *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997).

events, it necessarily follows that he suffered more than a de minimis injury.  Plaintiff testified

that Hafford choked him to the point of unconsciousness and threw him to the bathroom floor.

He further testified that Hafford kicked him in the back.  According to plaintiff the attack caused

him to experience blood in his urine.

Conversely, Hafford denied involvement in any physical altercations with Adams, and

specifically denied assaulting him on May 23-24, 2011.

Harris and Poche' investigated the alleged incident(s) when Adams reported it to them on

May 23-24.  However, they were not able to substantiate Adams' allegations.  Furthermore, at the

hearing, Adams' fellow inmates did not support his version of events.

Despite defendants' Federal Rule of Evidence 404(b) objection, the court has considered

the evidence that Hafford was involved in altercations with two other inmates in late July 2011

that resulted in his termination from employment for excessive use of force.[7]  Nonetheless, the

evidence does not establish that Hafford committed the batteries as alleged by plaintiff.

According to plaintiff, Hafford choked him until he was unconscious, and then threw him

to the ground.  If so, however, plaintiff should have sustained injuries to his head when his

unsupported head struck the floor.  However, he failed to report any such injuries.  Plaintiff also

alleges that Hafford kicked him.  Plaintiff concedes, however, that he did not suffer any resulting

bruises.  While it is certainly possible that someone could sustain internal injuries without

manifesting outward signs of physical injury, the medical record fails to document any of

---

[7]  Defendants petitioned the court to exclude testimony regarding Hafford's subsequent bad acts.  However, defendants introduced this evidence themselves when they submitted Harris's unusual occurrence report that discussed these events.  Accordingly, defendants' objection is overruled.

plaintiff's subsequent complaints regarding blood in the urine.  Moreover, on plaintiff's handwritten "Inmate Grievance" form he inconsistently states that Hafford "punched" him in the back.

Finally, the court observes that plaintiff had a motive for making these allegations against Hafford because in March 2011, Hafford wrote a disciplinary report against plaintiff for possession of a cell phone.

In sum, the undersigned finds that Hafford did not assault or batter plaintiff on May 23-24, 2011, or at any other time.  Even if the court were to assume for the sake of argument that some kind of confrontation occurred between Adams and Hafford on May 23-24, the court does not credit plaintiff's allegations regarding the severity of the encounters.  Plaintiff's physical injuries simply were not consistent with the alleged severity of the attacks.

### III.   Failure to Protect

a)   Law

It is well settled that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates or other guards.  *Longoria v. Texas*, 473 F.3d 586, 592-593 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33, 114 S.Ct. 1970, 1976-77 (1994)) (fellow inmates);  *Pauline v. HCF Admin.*, CIV. 12-00179 LEK, 2012 WL 1564500 (D. Haw. May 2, 2012) (other guards);  *Palton v. Jackson*, 5:06CV00198 SWW, 2009 WL 2762739 (E.D. Ark. Aug. 28, 2009) (other guards).  To prevail on a failure to protect claim, an inmate must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to the inmate's safety.  *Id*.  A prison official acts with the requisite deliberate indifference if he is aware of an "excessive risk

24

to inmate . . . safety," but disregards the risk.  *Id*.  Furthermore,

> the official must both be aware of facts from which the inference could be drawn
> that a substantial risk of serious harm exists and must in fact also have drawn the
> inference.  No liability exists, however, if an official reasonably responded to a
> known substantial risk, 'even if the harm was ultimately not averted.

*Id*. (citations and internal quotation marks omitted).

  b) <u>Plaintiff Failed to Establish that Poche' or Harris were Deliberately Indifferent to his Safety</u>

First, the court has not credited plaintiff's allegations that he was subjected to excessive force by Hafford on May 23-24, 2011.  Thus, Poche' and Harris could not have breached any duty to protect him.

Second, when plaintiff verbally advised Poche' and Harris that Hafford had choked him, Poche' and Harris took his allegations seriously, and investigated them.  Their investigation, however, did not support plaintiff's allegations.  There is no evidence that Harris and/or Poche' ignored plaintiff's complaint, or otherwise exhibited deliberate indifference to his plight.  In fact, when Hafford subsequently injured other inmates, Harris promptly terminated Hafford, and referred him for prosecution.

**IV.** **Inadequate Medical Care**

  a) <u>Law</u>

As a convicted inmate, plaintiff's claim for inadequate medical care is analyzed under the Eighth Amendment's prohibition against cruel and unusual punishment.  To establish liability, an inmate must adduce facts which "clearly evince" a serious medical need and the prison official's deliberate indifference to it.  *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).

25

Deliberate indifference in the context of an episodic failure to provide reasonable medical

care to a prisoner means that:  (1) the official was aware of facts from which an inference of

substantial risk of serious harm could be drawn; (2) the official actually drew that inference; and

(3) the official's response indicates that the official subjectively intended that harm occur.

*Thompson v. Upshur County, Tx.,* 245 F.3d 447, 458-59 (5th Cir. 2001).   "[T]he failure to

alleviate a significant risk that [the official] should have perceived, but did not is insufficient to

show deliberate indifference."  *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752,

756 (5th Cir. 2001).  Moreover, "deliberate indifference cannot be inferred merely from a

negligent or even a grossly negligent response to a substantial risk of serious harm."  *Thompson*,

245 F.3d at 459.  "Deliberate indifference encompasses only unnecessary and wanton infliction

of pain repugnant to the conscience of mankind."  *McCormick v. Stalder*, 105 F.3d 1059, 1061

(5th Cir. 1997); *see also Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999).  "[A] delay in

medical care violates the Eighth Amendment only if it is due to deliberate indifference and

results in substantial harm."  *Gregory v. McKennon*, 2011 WL 2473714 (5th Cir. June 22, 2011)

(unpubl.) (citation and internal quotation marks omitted).

Ordinarily, continuous medical care precludes a finding of deliberate indifference on the

part of prison officials.  *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Mayweather*

*v. Foti,* 958 F.2d. 91 (5th Cir. 1992).

b)   <u>Plaintiff Did Not Establish that He was Deprived of Adequate Medical Care</u>

Plaintiff's medical treatment records refute his allegations that he was deprived of

medical care for his serious medical condition of blood in his urine.  His records confirm that he

was regularly seen by the ECDC nurse.  His records also reveal that he was taken to E.A.

26

Conway Hospital when necessary.  His records fail to document any complaints of blood in his urine.  Furthermore, Nurse Middlebrooks testified that she would have documented any complaints of blood in Adams' urine and sent him to a doctor.  The court credits this testimony.

The court also credits Poche's testimony that he did not prevent plaintiff from going to the medical department.  The court further finds that Poche' did not thwart plaintiff's alleged efforts to go to the hospital.

## V.    Government Entity and Supervisory Liability

To the extent that plaintiff intended to sue defendants in their official capacities, the court observes that official-capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985) (citing, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55 (1978)).  To impose § 1983 liability against a government entity for the misconduct of one of its employees or officers, plaintiff must demonstrate that the constitutional deprivation was caused by a policy or custom of the entity.  *Kohler v. Englade*, 470 F.3d 1104, 1115 (5th Cir. 2006) (citing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 2036 (1978)).  "In a Section 1983 case, the burden of proving the existence of an unconstitutional municipal policy or established custom rests upon the plaintiff." *McConney v. City of Houston*,  863 F.2d 1180, 1184 (5th Cir. 1989).

In the case *sub judice*, plaintiff has not established an underlying constitutional violation by defendants in their individual capacities.  *A fortiori*, he has not identified a precipitating unconstitutional custom or policy enacted by the government entity.  *See Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (because the officers did not violate plaintiff's

27

constitutional rights, neither did the city).

Insofar as plaintiff seeks to hold Harris liable in his supervisory capacity, the court observes that supervisors can be held liable when the "enforcement of a policy or practice results in a deprivation of federally protected rights." *Bustos, supra* (citation omitted).  Again, however, because plaintiff has failed to allege or establish a constitutional violation by the individual directly involved in the challenged activity, he cannot show that any supervisor implemented a policy or custom that violated his constitutional rights.  *Bustos*, 599 F.3d at 468.

## VI.    The ECDC is not a Proper Party Defendant

This court previously declined to order service upon defendant, ECDC, because the ECDC is not an entity capable of being sued.[8]  Indeed, under Federal Rule of Civil Procedure 17(b), "capacity to sue or be sued shall be determined by the law of the state in which the district court is held," i.e., Louisiana.  To enjoy the capacity to be sued under Louisiana law, an entity must qualify as a "juridical person."  *Dejoie v. Medley*, 945 So.2d 968, 972 (La. App. 2d Cir. 2006) (citations omitted).  This term is defined by the Louisiana Civil Code as ". . . an entity to which the law attributes personality, such as a corporation or partnership." La. Civ. Code Art. 24. However, there is no evidence that the ECDC is so structured.  Rather, by all indications, the ECDC is, or was, a parish corrections facility operated by the East Carroll Parish Sheriff.  In fact, the sheriff is charged with operating the parish jail and ensuring that the inmates receive proper care.  *Oladipupo v. Austin*, 104 F. Supp.2d 626, 641 (W.D. La. 2000) (citing La. R.S. § 15:704); *Langley v. City of Monroe*, 582 So.2d 367, 368 (La. App. 2d Cir. 1991) (citations omitted).

---

[8]  A court's decision to withhold service for a defendant after screening the case under 28 U.S.C. § 1915A, is an implicit determination that plaintiff has no cognizable claims against that defendant.  *Sama v. Hannigan*, 669 F.3d 585, 589 (5th Cir. 2012).

Accordingly, defendant, ECDC, cannot be sued and must be dismissed, with prejudice.  *See*

*Darby v. Pasadena Police Dept.*, 939 F.2d 311 (5th Cir. 1991) (affirming district court's

dismissal, with prejudice, of defendant that could not be sued as an independent entity).[9]

## Conclusion

In reaching today's decision, the court emphasizes that plaintiff enjoys the burden of

proving his case by a preponderance of the evidence, i.e., that his allegations are more likely so,

than not so.  When, as here, plaintiff is involved in a swearing match against defendants, it is

vital that he support his version of events with corroborative evidence or witnesses, or failing

that, to present his allegations, over time, in a uniform and consistent manner, and to uncover

inconsistencies in defendants' version of events.  Plaintiff has not done so here; he has not

persuaded the court that his version of events is more likely so than not so.  *See e.g., Terry v.*

*Bossier Medium Sec. Facility*, 2010 WL 4875679 (W.D. La. Oct. 21, 2010) (evidence was close,

but plaintiff did not meet his burden of proof); *Bretado v. Kennedy*, 2007 WL 1989837 (E.D.

Tex. July 2, 2007) (plaintiff did not prove his case by preponderance of the evidence where

defendant's version of events was just as likely, if not more so, than plaintiff's version).

Therefore, the undersigned concludes that plaintiff has not established that defendants violated

his Eighth Amendment protections.

For the foregoing reasons,

---

[9]  The court possesses the inherent authority to dismiss the ECDC sua sponte.
*McCullough v. Lynaugh*, 835 F.2d 1126, 1127 (5th Cir. 1988) (citing *Link v. Wabash R.R. Co.*,
370 U.S. 626, 630-31 (1962)); *see also, Spann v. Woods*,66 F.3d 322, 1995 WL 534901 (5th Cir.
1995) (the district court sua sponte dismissed claims under 12(b)(6) although the defendants
never filed a motion to dismiss, nor did they plead failure to state a claim in their answer);
*McCoy v. Wade*, 2007 WL 1098738, *1 (W.D. La. Mar. 12, 2007) (the report and
recommendation itself provides adequate notice to the parties).

**IT IS RECOMMENDED** that the motion for judgment on partial findings [doc. # 48] filed by defendants, Warden Harris, Captain Poche', and Tarren Hafford  be **DENIED**.

**IT IS FURTHER RECOMMENDED** that judgment be entered in favor of defendants, Warden Harris, Captain Poche', Tarren Hafford, and the East Carroll Detention Center, and against plaintiff Cedric Adams dismissing, with prejudice, plaintiff's claims, in their entirety.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 13th day of February 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE